IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ELDER S.,                                    :
                                             :
        Plaintiff,                           :
                                             :
v.                                           :          CIVIL ACTION NO.
                                             :          1:18-CV-00753-LTW
ANDREW SAUL,                                 :
                                             :
Commissioner of Social Security,             :
                                             :
        Defendant.                           :

**ORDER AND OPINION ON AN APPEAL FROM A
SOCIAL SECURITY DISABILITY ACTION[1]**

On May 14, 2014, Plaintiff protectively filed an application for Supplemental security income under the Social Security Act, alleging he became disabled on December 1, 2005. (Tr. 15). Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying Plaintiff's claims.

After Plaintiff's application was denied initially on August 27, 2014, and on reconsideration on February 4, 2015, Plaintiff appealed the denial to an Administrative Law Judge ("ALJ"), who denied Plaintiff's claims on April 4, 2017, finding Plaintiff was not disabled. (Tr. 12, 15-26, 88, 102). Plaintiff appealed the ALJ's decision to the

_____

[1] The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (See Mar. 30, 2018, Docket Entry). Therefore, this Order constitutes a Final Order of the Court.

Appeals Council, which denied Plaintiff's request for review on January 24, 2018. (Tr. 1-6). Plaintiff then appealed the decision to this Court. (Doc. 3). This case is now before the undersigned upon the administrative record and the parties' pleadings and briefs, and is ripe for review pursuant to 42 U.S.C. § 405(g).

For the reasons set forth below, it is **ORDERED** that the decision of the Commissioner be **AFFIRMED**.

## I.  STANDARD FOR DETERMINING DISABILITY

An individual is considered to be disabled for purposes of disability benefits if he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A); see also 42 U.S.C. § 423(d)(1)(A). The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his or her previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 1382c(a)(3)(B)-(G); see also 42 U.S.C. § 423(d)(2)-(3).

The burden of proof in a social security disability case is divided between the claimant and the Commissioner. The claimant bears the initial burden of establishing the existence of a "disability" by demonstrating that he or she is unable to perform his

2

or her former type of work. Once the claimant has met this burden, the burden shifts to the Commissioner to show that, considering claimant's age, education, work experience, and impairment, there are some other types of jobs that exist in the national economy that the claimant can perform. The overall burden, however, rests upon the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy. Doughty v. Apfel, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001).

As summarized below, a five-step sequential analysis must be used when evaluating a disability claim.

(1)  The Commissioner must determine whether the applicant is currently working; if so, the claim is denied.

(2)  The Commissioner must determine whether the claimed impairment is severe; that is, whether the impairment or combination of impairments significantly limits the individual's physical or mental ability to do basic work activities; if not, the claim is denied.

(3)  The Commissioner must determine whether the impairment equals or exceeds in severity certain impairments described in the impairment listings in the regulations; if it does, the claimant is automatically entitled to disability benefits.

(4)  The Commissioner must determine whether the applicant has sufficient residual functional capacity to perform past work; if so, the claim is denied.

(5)  The Commissioner must determine, on the basis of claimant's age, education, work experience, and residual functional capacity, whether the applicant can perform any other gainful and substantial work within the economy; if so, the claim is denied.

See 20 C.F.R. §§ 416.920-416.976.

AO 72A
(Rev.8/82)

## II.    **FINDINGS OF FACT AND CONCLUSIONS OF LAW OF THE ALJ**

The ALJ made the following findings of fact and conclusions of law:

(1)    The claimant has not engaged in substantial gainful activity since May 14, 2014, the application date (20 C.F.R. §§ 416.971, et seq.).

(2)    The claimant has the following severe impairments: cannabis use disorder; schizoaffective disorder, depressive type; and anxiety (20 C.F.R. §§ 416.920(c).

(3)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926).

(4)    The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: The claimant is able to understand, remember and carry out simple instructions. He is able to make simple work-related decisions. He is able to maintain concentration for periods of two hours at a time in an eight-hour workday. He is able to ask simple questions and able to work in a nonpublic area. His interaction with the general public, coworkers and supervisors should be brief, superficial and occasional, but no more than one third of the workday. He would work better with things rather than people and no teamwork. Any interpersonal interaction should be incidental to the work being performed. He is able to sustain routine work without special supervision. He is able to adapt to occasional changes in the work processes and environment, and he is able to be aware of normal hazards and take appropriate precaution. He is able to travel to unfamiliar places. Due to his medical conditions and symptoms, he would be off task at unpredictable times up to 4% of the work period and he would be absent one day every forty-five days.

(5)    The claimant has no past relevant work (20 C.F.R. §§ 416.965).

(6)    The claimant was born on November 23, 1971, and forty-two years old, which is defined as a younger individual age eighteen to forty-nine, on the date the application was filed (20 C.F.R. § 416.963).

(7)    The claimant has at least a high school education, and is able to

AO 72A
(Rev.8/82)

communicate in English (20 C.F.R. § 416.964).

(8) Transferability of job skills is not an issue because the claimant does not have past relevant work (20 C.F.R. § 416.968).

(9) Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 416.969 and 416.969(a)).

(10) The claimant has not been under a disability, as defined in the Social Security Act, since May 14, 2014, the date the application was filed (20 C.F.R. §§ 416.920(g).

(Tr. 21-30).

## III.  CLAIMS OF ERROR

Plaintiff alleges the decision of the Commissioner is in error for the reasons set forth below.

A.  The ALJ erred when she considered the evidence from View Point Health as an acceptable medical source and relied upon it to reject the opinion of Dr. Snook, an examining consultant.

B.  The ALJ erred when she rejected Plaintiff's complaints of symptoms based on his demeanor during the hearing because she failed to consider the times during the hearing that he exhibited symptoms consistent with his complaints.

C.  The ALJ erred when she relied upon Plaintiff's daily activities to reject Dr. Snook's opinion because Plaintiff's demeanor was not inconsistent with Dr. Snook's opinion.

D.  The ALJ erred when she failed to consider whether Plaintiff met listing 12.03 (applicable to schizophrenia spectrum and other psychotic disorders).

## IV.  SCOPE OF JUDICIAL REVIEW

The scope of judicial review of the Commissioner's denial of social security

benefits is limited.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  The only function of the court is to determine whether there is substantial evidence in the record to support the findings and decision of the Commissioner and whether proper legal standards were applied in the fact-finding process.  The Commissioner's findings are conclusive if supported by substantial evidence and proper legal standards were applied.  Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987); Hillsman v. Bowen, 804 F.2d 1179, 1180 (11th Cir. 1986); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983).

Substantial evidence is more than a scintilla, but less than a preponderance.  Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005).  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify a refusal to direct a verdict were the case before a jury.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Hillsman, 804 F.2d at 1180; Bloodsworth, 703 F.2d at 1239.  "In determining whether substantial evidence exists, we must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision."  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  In contrast, our review of the ALJ's application of legal principles is plenary.  Walker, 826 F.2d at 999.  The decision reached by the Commissioner must be affirmed if it is supported by substantial evidence-even if the evidence preponderates against the

6

Commissioner's findings.  Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158–59 (11th Cir. 2004) (per curiam).

## V.    BACKGROUND FACTS

On April 23, 2014, Plaintiff filed applications for a period of disability and disability insurance benefits, alleging disability due to major depressive disorder, schizoaffective disorder, anxiety, insomnia, and mood swings.  (Tr. 46, 151, 172). Plaintiff alleges that due to his mental impairments, he has trouble with his memory, talking, completing tasks, concentration, understanding, following instructions, and getting along with others.  (Tr. 223).

Plaintiff has been treated for his mental health problems starting in July 2014.  Dr. John Moseri of Newport Integrated Behavioral Healthcare saw Plaintiff concerning Plaintiff's complaints of depression symptoms as well as paranoia and delusions.  (Tr. 269).  Dr. Moseri indicated in his notes that Plaintiff reported psychotic symptoms that appear to be chronically present; his behavior was described as disorganized, minimally communicative, and inattentive; his affect was described as inappropriate to the circumstances and he appeared flat, glum, and sad looking; he had episodes of inappropriate anger; and there were indications that he has been hallucinating.  (Tr. 269-70).  Dr. Moseri also noted, however, that Plaintiff's speech was normal; his language skills were intact; his associations were intact and logical; there were no apparent signs of hallucinations, delusions, bizarre behaviors or other indicators of psychotic process; his thinking was logical and his thought content appeared appropriate; his short and long

AO 72A
(Rev.8/82)

term memory was intact; he had the ability to abstract and to do arithmetic calculations; he was fully oriented; and his vocabulary and fund of knowledge indicate cognitive functioning in the normal range. (Tr. 270-71). Dr. Moseri determined Plaintiff's global assessment of functioning score was sixty-five, indicating some mild symptoms. (Tr. 271). See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32, 34 (Text Revision 4th ed. 2000) (indicating some mild symptoms such as depressed mood and mild insomnia or some difficulty in social, occupational, or school functioning, but generally functioning pretty well and has some meaningful interpersonal relationships).

On August 27, 2014, psychological consultant Dr. Valerie Besses conducted a mental status examination, but could not perform testing due to Plaintiff's difficulty tolerating and cooperating with the testing process. (Tr. 276, 280). Plaintiff also was fidgety; he appeared suspicious, agitated and distressed; his thought content appeared to indicate current paranoid psychosis and was characterized by irrational ideas and frequent derailment while talking; he appeared to react to internal stimuli and shook his head and mumbled to himself throughout the interview; and although he produced understandable speech at times, his voice was soft and hard to follow. (Tr. 277-78, 280). Plaintiff indicated that the room had hidden cameras and microphones and that the government was recording his actions. (Tr. 277-79). Plaintiff also complained that he experienced visual, auditory, and tactile hallucinations at night. (Id.). Dr. Besses noted Plaintiff's presentation was dramatic, his extreme beliefs about being recorded and

poisoned appeared exaggerated, and questioned his credibility. (Tr. 280). Dr. Besses diagnosed Plaintiff with unspecified mood disorder, unspecified trauma and stressor related disorder, and malingering, but found that a psychotic disorder is not indicated. (Tr. 281). Dr. Besses concluded Plaintiff was not impaired in his ability to understand, carry out, and remember complex or detailed instructions; he was moderately limited for sustaining concentration, persistence and pace for timely completion of tasks due to subjective distress and chronic irritability; his ability to interact appropriately with coworkers, supervisors, and the public was moderately limited due to distrust of others and social avoidance; and he was moderately limited in his ability to adhere to a typical work schedule or adapt to the stressors of a typical work environment.

At the behest of Plaintiff's counsel, a second psychological consultant, Dr. Steven Snook conducted a psychological status exam on October 5, 2016. (Tr. 68, 315-22). Dr. Snook found Plaintiff appeared hostile, agitated, had difficulty communicating and recollecting information and was minimally compliant with the examination. (Tr. 319). Plaintiff was oriented to person and place, his grooming and hygiene were disheveled, his speech was rambling, and he became non-communicative. (Tr. 322). Dr. Snook also noted that although Plaintiff denied suicidal ideation, he had persistent auditory hallucinations and paranoia and he often becomes frustrated. (Tr. 322). Dr. Snook further observed that while Plaintiff appeared anxious, Plaintiff did not describe symptoms of panic attacks, phobias, or obsessive compulsive disorder. (Tr. 322). Plaintiff declined to repeat four of four words immediately, he had difficulty remaining

9

focused, and his insight and judgment were impaired. (Tr. 322). Dr. Snook observed Plaintiff's speech was rambling; he became noncommunicative; he had difficulty recollecting information; he was only minimally compliant with the examination; his thought processes were deranged and disorganized; and he presented as agitated, anxious, hostile, and paranoid. (Tr. 317-22).

Dr. Snook diagnosed Plaintiff with schizophrenia, multiple episodes, currently in acute episode with hallucinations and cannabis use disorder, mild. (Tr. 322). Dr. Snook opined that Plaintiff would have no problem understanding, remembering, and carrying out simple instructions or making judgments on simple, work-related decisions, but would have a marked problem doing the same for complex instructions and complex work-related decisions. (Tr. 316). Dr. Snook concluded that Plaintiff would have difficulty sustaining concentration, persistence, and pace to permit timely completion of tasks due to his agitation and poor focus. (Tr. 322). Dr. Snook opined that Plaintiff would have an extreme problem interacting appropriately with the public and a marked problem interacting with supervisors and coworkers due to agitation, paranoia, hostility, poor emotional containment, and disorganized thought processes. (Tr. 317-22). Dr. Snook also found Plaintiff would have a marked problem responding appropriately to usual work situations and changes in a routine work setting. (Tr. 317). The remainder of the medical evidence has been summarized in the body of the decision of the ALJ and will not be repeated here except as necessary to address the issues presented.

AO 72A
(Rev.8/82)

# VI. ANALYSIS OF CLAIMS OF ERROR

## A. The ALJ Properly Considered Dr. Snook's Opinion

Plaintiff argues the ALJ erred when she considered Plaintiff's mental health treatment provider, View Point Health,[2] as an acceptable medical source and relied upon evidence from View Point to reject the opinion of Dr. Snook, an examining consultant. The Commissioner contends that the ALJ properly found the conclusions of Dr. Snook were at odds with Plaintiff's mental status examinations at View Point, Plaintiff's activities of daily living, and the ALJ's observations of Plaintiff's demeanor during the hearing. Additionally, the Commissioner contends that even if the ALJ erroneously referred to View Point as a treating source, Plaintiff was not prejudiced by the misstatement because the ALJ did not assign controlling weight to View Point's records, as would be allowable for a treating physician. The Commissioner further points out the ALJ was required to consider View Point's records even if View Point was not a treating physician.

### 1. The ALJ's Evaluation of Dr. Snook's Opinion

Although the ALJ afforded some weight to the consultative opinion of Dr. Snook, the ALJ rejected Dr. Snook's opinion that Plaintiff's agitation and poor focus would cause him difficulty sustaining concentration, pace and persistence to permit the completion of assigned tasks. The ALJ noted that Dr. Snook's opinion was a one-time

---

[2] The parties frequently refer to View Point Health as "Viewpoint." Because the medical records reflect that the name is View Point Health, this Court will refer to it as "View Point" going forward.

examination, and compared Dr. Snook's opinion to records from View Point.  In the ALJ's view, the records from View Point tended to show Plaintiff had a greater degree of mental health functioning.  (Tr. 23, 24).  The ALJ pointed out that View Point's records reflect that Plaintiff was well-groomed, his eye contact was appropriate, his behavior was calm, his attitude was cooperative, his speech was clear, his mood was euthymic, his affect was full, thought processes were logical and within normal limits, and he remained fully oriented with normal thought processes and without delusions. (Tr. 23).  The ALJ referred to Plaintiff's medical records at View Point as being mental status examinations by Plaintiff's treating physicians.  (Tr. 24). The ALJ also pointed out that during the hearing, Plaintiff was attentive to questioning and was able to sustain conversation, to sustain his train of thought, and to answer questions with meaningful responses without confusion.  (Tr. 22).  Plaintiff was able to testify regarding his educational level, living arrangements, driving patterns, applications for jobs he applied for since his alleged onset date, his work at a car wash, and his ability to perform household chores.  (Tr. 22).

The ALJ also rejected Dr. Snook's opinion of Plaintiff's extreme limitations with interacting with the public and his marked limitation interacting with co-workers and supervisors on the grounds that Dr. Snook's conclusion was inconsistent with the Plaintiff's activities of daily living.  (Tr. 23).  The ALJ pointed out that Plaintiff shares a residence with other boarders in a boarding house, and that there were no reported difficulties with Plaintiff living in a boarding house; that Plaintiff reported that he gets

12

along with family and authority figures, that he goes out to dinner with his sister; that he can wash cars and use the money to buy beer and thus can shop and interact, and can socialize with people in the neighborhood when smoking marijuana.

The ALJ also found Plaintiff's sister's reports to Dr. Snook that Plaintiff suffered from paranoia, isolation and auditory hallucinations were inconsistent with the overall "mental status examinations by the claimant's treating physicians at Viewpoint." (Tr. 24 (explaining that "as for reports of paranoia, isolation and auditory hallucinations, these reports were made to the CE by the claimant's sister and are inconsistent with the overall mental status examinations by the claimant's treating physicians at Viewpoint" which indicated that Plaintiff "had no perceptual disturbances, hallucinations and the claimant adamantly denied active ideations and symptoms of psychosis")). The ALJ also credited the state agency non-examining medical consultant opinions because their opinions were not inconsistent with the medical evidence as a whole. (Tr. 24). Finally, the ALJ found Dr. Snook's report occurred during a period in which Plaintiff was not taking his medication and was drinking six packs of beer every day, and smoking marijuana. (Tr. 24).

2. <u>The ALJ Incorrectly Referred to the Mental Health Professionals at View Point as Treating Physicians, But the Error Was Harmless</u>

Plaintiff first argues that the ALJ improperly elevated the status of the opinions from the professionals at View Point Health to that of a treating physician and relied on that elevated status to reject the opinion of Dr. Snook. Although Plaintiff was treated

for mental health issues at View Point Health, Plaintiff is correct that the care providers from View Point Health cannot be considered treating physicians and were not acceptable medical sources. (Tr. 290-315). Generally, the opinions of treating physicians are given controlling weight unless good cause is shown because treating physicians are "most able to provide a detailed, longitudinal picture of the claimant's medical impairments." 20 C.F.R. § 416.927(d); see also Reynolds-Buckley v. Comm'r of Soc. Sec., 457 F. App'x 862, 864 (11th Cir. 2012). However, not every provider a claimant encounters qualifies as a treating source. Pursuant to 20 C.F.R. § 416.927(a)(2):

> Treating source means your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, [the Social Security Administration] will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s). We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability. In such a case, we will consider the acceptable medical source to be a nontreating source.

(Id.) Thus, to qualify as a treating source, the medical provider must be an acceptable medical source, such as a physician, and the medical source must have an ongoing treatment relationship with the claimant. Reynolds-Buckley, 457 F. App'x at 864; Nyberg v. Comm'r of Soc. Sec., 179 F. App'x 589, 591 (11th Cir. 2006); 20 C.F.R. §§

14

404.1502(a), 416.902(a). A claimant generally has an ongoing treatment relationship with a physician when medical evidence establishes that the claimant sees or has seen the physician with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for the claimant's medical condition(s). Nyberg, 179 F. App'x at 591, citing 20 C.F.R. §§ 404.1502, 416.902.

Here, there is no indication that anyone generating the medical records at View Point were acceptable medical sources. An acceptable medical source means a medical source who is a licensed physician, licensed psychologist, a licensed optometrist, licensed podiatrist, and a qualified speech-language pathologist.[3] 20 C.F.R. §§ 404.1502, 416.902. The medical records from View Point Health were authored by Mia Malika Wolfrey, a Licensed Master of Social Work, and Oyenike Rashidat Sanni (an Advanced Practice Registered Nurse). (Tr. 304, 311, 314). Nurses and social workers have not traditionally been considered acceptable medical sources. Everett v. Soc. Sec. Admin., Comm'r, No. 18-13697, 2019 WL 2522201, at *2 (11th Cir. June 19, 2019). Furthermore, Sanni and Wolfrey both only treated Plaintiff on one occasion. Because Sanni and Wolfrey were not acceptable medical sources and only treated Plaintiff on one occasion each, they are not entitled to any special deference as a treating physician. Everett, 2019 WL 2522201, at *2; Medina v. Soc. Sec. Admin., 636 F. App'x 490, 493

---

[3] Title 20, Section 416.902 of the Code of Federal Regulations was amended in 2017 to reflect that Licensed Advanced Practice Registered Nurses, such as Oyenike Rashidat Sanni, who treated Plaintiff at View Point, are acceptable medical sources. The regulation makes clear, however, that the amendment only applies to claims filed on or after March 27, 2017.

15

(11th Cir. 2016) (explaining that nurses could not be considered a treating source because they are not listed in the regulations as acceptable medical sources and that doctor could not be considered a treatment source because he only examined the plaintiff on one occasion and did not have an ongoing treatment relationship with her); Lawton v. Comm'r of Soc. Sec., 431 F. App'x 830, 833-34 (11th Cir. 2011).

That being said, 20 C.F.R. § 416.927(f)(1) directs the Commissioner to use the same factors used to evaluate the opinions of "acceptable medical sources" when evaluating the opinions of "other sources." 20 C.F.R. § 416.927(f)(1). It further provides that "[d]epending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an acceptable medical source or from a nonmedical source may outweigh the medical opinion of an acceptable medical source, including the medical opinion of a treating source." 20 C.F.R. § 416.927(f)(1). For example, in some cases it is appropriate to give more weight to the opinion of a medical source who is not an acceptable medical source if she provided better supporting evidence and explanation for the opinion and "the opinion is more consistent with the evidence as a whole." Id. Accordingly, it was proper for the ALJ to consider the treating records from View Point.

Plaintiff contends, however, that the ALJ improperly elevated the status of the View Point treatment providers by diminishing the weight of Dr. Snook's opinion due to Dr. Snook's inconsistency with View Point, which the ALJ believed to be Plaintiff's treating physician. In this case, the ALJ did not assign the opinion of View Point

16

controlling weight. Nor did the ALJ appear to accord special deference to View Point providers as treatment physicians when rejecting the opinion of Dr. Snook. While the ALJ clearly relied upon the treatment records from View Point, the ALJ also considered the entire record when rejecting the opinion of Dr. Snook. The records from View Point were just one source among many sources the ALJ relied upon to reach her conclusions. The ALJ also credited the state agency non-examining medical consultants, who each found Plaintiff had no more than moderate limitations due to his mental health conditions. Additionally, the ALJ also concluded that Dr. Snook's opinion was inconsistent with Plaintiff's demeanor during the hearing as well as Plaintiff's activities of daily living. Specifically, the ALJ cited Plaintiff's ability to shop, drive a car, use pubic transportation, live in a boarding house with house mates, socialize with others, go out to dinner with his sister, maintain a relationship with his sister, his three brothers, and authority figures, and Plaintiff's self-report to View Point just before Dr. Snook's evaluation that he was actively seeking employment as indicative of a higher degree of mental functioning. (Tr. 22-24). The ALJ also found Dr. Snook's opinion inconsistent with Plaintiff's generally conservative treatment for mental health issues, and found that the medical evidence as a whole was more consistent with the notion that Plaintiff had more moderate impairments. (Tr. 18, 21, 24).

The ALJ observed that the medical evidence failed to corroborate the degree of debility alleged by Plaintiff and observed that notes from Newport Integrated Healthcare indicated that the Plaintiff reported being unemployed because he lacked motivation to

17

drive to look for jobs because of legal restraints related to having been incarcerated, that his past psychiatric history was entirely negative in that he had no psychiatric treatment, no hospitalizations, and no suicidal ideations, no history of depression or anxiety, and no prescriptions for psychotropic medications. (Tr. 21). The ALJ also observed that Plaintiff's mental status examination from Newport in 2014 reflected that Plaintiff had some slowed speech as a result of depression, but overall, his affect was appropriate, associations were intact, there was no psychosis, his memory was intact, and his thinking and cognitive functioning was normal. (Tr. 21). The ALJ further observed that Plaintiff was assigned a Global Assessment of Functioning score of 65, indicating only mild symptoms. (Tr. 21). Under these circumstances, it is apparent that the ALJ did not improperly elevate the status of View Point's records.

3.      The ALJ's Assessment of Plaintiff's Impairments at Step Two Was Harmless Error

Plaintiff further contends that the ALJ's reliance on View Point as the source of Plaintiff's severe impairments at Step two of the sequential evaluation process also violates the regulations and agency policy because View Point was not an acceptable medical source. In support, Plaintiff notes that the ALJ found that Plaintiff suffered from schizoaffective disorder at Step two, and points out that only the professionals from View Point offered the diagnosis of schizoaffective disorder, depressive type. Plaintiff is correct that opinions from individuals who are not considered acceptable medical sources cannot establish the existence of an impairment. McGriff v. Comm'r,

18

Soc. Sec. Admin., 654 F. App'x 469, 472 (11th Cir. 2016); Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1160 (11th Cir. 2004). Plaintiff also correctly notes that because the healthcare providers at View Point were not acceptable medical sources, they could not establish the existence of an impairment at Step two.

Even assuming that View Point was the only provider to diagnose schizoaffective disorder, however, Plaintiff does not explain why inclusion of schizoaffective disorder at Step two was harmful to him. "Nothing requires that the ALJ must identify, at step two, all of the impairments that should be considered severe." Heatly v. Comm'r of Soc. Sec., 382 F. App'x 823, 825 (11th Cir. 2010); Jackson ex rel. K.J. v. Astrue, 734 F. Supp. 2d 1343, 1361 (N.D. Ga. 2010) (harmless error analysis at step two of child's disability case). As a result, a failure to list an impairment at step two is harmless error when: (1) the ALJ found the plaintiff suffered from other severe impairments; (2) the ALJ continued with the sequential evaluation process; and (3) the ALJ considered all of the plaintiff's impairments at other steps of the evaluation process. See Heatly, 382 F. App'x. at 825 & n. 3; see also White v. Astrue, No. 1:08-CV-827, 2010 WL 1729113, at *5 (M.D. Ala. Apr. 28, 2010); Zellner v. Astrue, No. 3:08-CV-1205, 2010 WL 1258137, at *4 (M.D. Fla. Mar. 29, 2010); Newton v. Astrue, No. 1:06-CV-1542-AJB, 2008 WL 915923, at *10 (N.D. Ga. Apr. 1, 2008) (noting that courts have found step two error to be harmless "as long as the ALJ found at least one severe impairment and continued the sequential analysis and ultimately addressed all of the claimant's impairments in determining her residual functional capacity") (quoting Swartz v.

Barnhart, 188 F. App'x 361, 368 (6th Cir. 2006)). At a minimum, the ALJ properly found one severe impairment at step two because she found that Plaintiff had cannabis use disorder, an opinion shared by Dr. Snook and the professionals at View Point Health. (Tr. 302, 310, 322). Additionally, the ALJ continued the sequential analysis and provided a thorough analysis of Plaintiff's impairments and limitations at step four of the sequential analysis. The fact that the ALJ may have identified additional severe impairments at Step two which were unsupported by an acceptable medical source has not been shown to harm Plaintiff.

4.    Dr. Snook and View Point's Records Were Not Fully Consistent

Plaintiff next argues the ALJ should not have relied upon View Point's records to discount Dr. Snook's opinion because Dr. Snook's and View Point's records were consistent. In support, Plaintiff points out that View Point's records indicate that on his first visit, he had the following symptoms: audio and visual hallucinations, anhedonia, low energy, insomnia with sleep disturbance and nightmares, poor motivation, poor concentration, decreased appetite, worthlessness, isolation and avoidance, irritability, daily anxiety, and passive suicidal ideation. (Tr. 291, 307-08). While these observations do suggest that Plaintiff suffered mental health symptoms at the time, they are not fully consistent with Snook's conclusions. As the ALJ observed, although View Point records indicated that during one visit Plaintiff was inattentive, his short term memory was impaired, and he was depressed, they also reflect that Plaintiff remained fully oriented with normal thought processes and without delusions. (Tr. 23, 307).

20

Indeed, View Point's records reflect that Plaintiff is oriented to person and place, that his associations are logical and connected, his thought content was within normal limits, he was able to name objects, his speech was at a normal rate and rhythm, and he denied hallucinations. (Tr. 306, 308). While Dr. Snook's and View Point's records appeared to agree that Plaintiff was irritable, agitated, and uncooperative, only Dr. Snook described Plaintiff's presentation as notable for his hostility, paranoia, and poor emotional containment. (Tr. 307-08, 322). Only Dr. Snook described Plaintiff's speech as rambling and at times non-communicative, noted that Plaintiff's thought processes were deranged, noted that Plaintiff was only minimally compliant with the examination, and noted that Plaintiff had persistent auditory hallucinations and paranoia. (Tr. 319, 321-22). Furthermore, Dr. Snook's observations were fully inconsistent with records from Plaintiff's other visit with View Point Health, which was only a few months before Dr. Snook's psychological status examination and a few days before the visit at View Point discussed above. (Tr. 291, 315). On July 8, 2016, the social worker who saw Plaintiff indicated that Plaintiff's behavior, attitude, speech, mood, and affect were within normal limits and Plaintiff was cooperative. (Tr. 301-02). Plaintiff's thought content, memory, and cognition were within normal limits, his thought processes were logical, his language was clear and within normal limits, his memory was intact, and he had no reported perceptual disturbances. (Tr. 301-02).

Plaintiff next questions the ALJ's interpretation of the evidence presented by Nurse Sanni at View Point that Plaintiff retained most of his functionality. Plaintiff

contends that because Nurse Sanni indicated that Plaintiff had schizoaffective disorder, depressive type and mild cannabis use disorder, the ALJ's conclusion that Plaintiff retained most of his mental functionality equates to ALJ arbitrarily substituting her own hunch and intuition for the diagnosis of a medical professional. The ALJ did not substitute her own hunch, however, and instead, adopted Nurse Sanni's findings that Plaintiff suffered from schizoaffective disorder, depressive type and mild cannabis use disorder. (Tr. 17). Plaintiff presents no medical evidence that a person cannot both have schizoaffective disorder, depressive type, and mild cannabis use disorder, and also retain most of his mental functioning.

Rather than reject the diagnosis, the ALJ explains in her opinion that Plaintiff displayed various clinical signs consistent with the conclusion that Plaintiff retained most of his functionality, noting that Plaintiff remained fully oriented with normal thought processes and without delusion. (Tr. 23). Plaintiff's remaining mental functioning is a decision reserved to the commissioner, and it is proper for the ALJ to make conclusions as to Plaintiff's remaining mental functioning. Buley v. Comm'r of Soc. Sec., 739 F. App'x 563, 569 (11th Cir. 2018) ("Although an ALJ will consider a treating source's opinion on the claimant's residual functional capacity, the final responsibility for deciding this issue is reserved to the Commissioner."); 20 C.F.R. § 416.927(d)(2) (explaining that the final responsibility for determining a claimant's residual functional capacity is reserved to the Commissioner).

5.  <u>Plaintiff Properly Relied Upon the Entire Record When Discounting Dr. Snook's Opinion</u>

Plaintiff further insists that the ALJ cherry-picked only the findings that supported her view without considering the negative findings from View Point.  Plaintiff argues the ALJ did not discuss social worker Wolfrey's notes that Plaintiff's symptoms included audio and visual hallucinations, anhedonia, low energy, insomnia with sleep disturbance and nightmares, poor motivation, poor concentration, decreased appetite, worthlessness, isolation and avoidance, irritability, daily anxiety and passive suicidal ideation.  (Tr. 291).  While Plaintiff is correct that Wolfrey's notes show Plaintiff reported these symptoms, there is nothing in the record that tends to show that Wolfrey endorsed these symptoms.  (Tr. 301).  Indeed, Wolfrey indicated that Plaintiff was calm and cooperative; that his speech, language, affect, and attitude were within normal limits; that his thought content was within normal limits with no paranoia, delusions, or perceptual disturbances; and that his memory and cognition was within normal limits.  (Tr. 301-02).  Additionally, the ALJ credited the opinions by the state agency non-examining medical consultants, who evaluated Plaintiff and his sister's reports of these types of symptoms, yet still found Plaintiff's mental impairment caused no more than moderate limits on Plaintiff's ability to understand and remember detailed instructions, maintain attention and concentration for extended periods, interact with the general public, coworkers, and supervisors, and respond to changes in the work setting.  (Tr. 84, 97-99).

23

Furthermore, nothing in the regulations requires ALJs to apply an all or nothing approach when assessing medical opinions. Hand v. Soc. Sec. Admin., Comm'r, No. , 2019 WL 4447206, at *4 (11th Cir. Sept. 17, 2019); Padgett v. Comm'r of Soc. Sec., No. 6:17-CV-1198-Orl-DCI, 2019 WL 1102193, at *3 (M.D. Fla. Mar. 8, 2019). Nor do the regulations require the ALJ to specifically refer to every piece of evidence. Hennes v. Comm'r of Soc. Sec., 130 F. App'x 343, 348 n.11 (11th Cir. 2005); Padgett, 2019 WL 1102193, at *3 (citing Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005)). While the ALJ is obligated to consider all relevant medical evidence and may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding, the ALJ need only provide enough reasoning in the decision for a reviewing court to conclude that the ALJ considered the plaintiff's medical condition as a whole. Packer v. Comm'r, Soc. Sec. Admin., 542 F. App'x 890, 891-92 (11th Cir. 2013). Here, the ALJ clearly considered the entire medical record as a whole.

6. The ALJ Appropriately Credited the Observations of View Point's Mental Health Professionals and Adequately Explained the Impact of View Point's Records on Her Decision

Plaintiff next faults the ALJ's opinion on the grounds that the ALJ did not define the weight she assigned the opinions of Plaintiff's medical providers. When evaluating medical evidence, the ALJ must "state with particularity the weight [s]he gave the different medical opinions and the reasons therefore." Hines v. Comm'r of Soc. Sec., 585 F. App'x 758, 765 (11th Cir. 2014) (citing Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981)). This rule only applies to medical opinions, which are defined as

24

"statements from *acceptable medical sources* that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions. 20 C.F.R. § 416.927(a)(1) (emphasis added). As discussed above, however, View Point's records did not come from acceptable medical sources.

For opinions from nonmedical sources and medical sources who are not acceptable medical sources, the ALJ "generally should explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." 20 C.F.R. § 416.927(f)(1). While the ALJ did not assign a particular weight to the mental status examinations by View Point, the discussion of View Point's records throughout the ALJ's decision make it clear that the ALJ credited View Point's findings. At several points, the ALJ rejects Dr. Snook's findings, in part, on the grounds of the records from View Point's mental status examinations. For instance, the ALJ observed that although Dr. Snook found Plaintiff would likely have difficulty sustaining concentration, persistence, and pace due to Plaintiff's agitation and poor focus, View Point noted on one visit that Plaintiff's behavior was calm, his attitude was cooperative, his speech was clear, and his thought processes were logical, and his thought content was within normal limits. (Tr. 23). The ALJ further acknowledged that View Point found Plaintiff was inattentive, his short-term memory was impaired, and he displayed

25

a depressed mood, the ALJ further credited View Point's findings that Plaintiff was fully oriented, with normal thought processes, and without delusions. (Tr. 23). With respect to the weight given to View Point's records, it is apparent from a review of the entire decision that the ALJ gave them considerable weight because she found them consistent with Plaintiff's activities of daily living, his demeanor at the hearing, as well as other evidence in the record and relied upon it constantly to reject Dr. Snook's opinion.

Although the ALJ did not assign a weight to the medical evidence generated by the professionals at Newport Integrated Behavioral Healthcare ("Newport") or discuss this evidence at length in the opinion, the failure to assign such evidence weight was harmless because Newport's records suggest a higher degree of mental functioning. The ALJ's failure to articulate the weight given a treating physician's opinion which does not directly contradict the ALJ's ultimate findings is considered harmless error. Denomme v. Comm'r, Soc. Sec. Admin., 518 F. App'x 875, 877-79 (11th Cir. 2013); Wright v. Barnhart, 153 F. App'x 678, 684 (11th Cir. 2005). In this case, records from Newport, while noting Plaintiff's glum mood, inattentiveness, and minimal communication, also noted that Plaintiff's speech was normal, his language skills were intact, his associations were intact and logical, he had no signs of hallucinations, delusions or bizarre behavior, his thinking was logical, his though content appeared appropriate, his long and short term memory was intact, he could abstract and do arithmetic calculations, he was fully oriented, he was cooperative, and he had a Global Assessment of Functioning score of sixty-five. (Tr. 271).

AO 72A
(Rev.8/82)

**B.    The ALJ Properly Considered Plaintiff's Daily Activities When Rejecting Dr. Snook's Opinion**

Plaintiff argues his daily activities do not provide a basis for rejecting Dr. Snook's opinion about his limitations in interacting with coworkers, supervisors, and the general public because the ALJ omitted to consider (1) Plaintiff's inability to get along with others at the boarding house where he stays, maintain friendships, and his belief that people are listening to him and are against him; (2) his inability to trust anyone other than his sister, and his claims that if he tried to live alone, he would be lonely; (3) his reliance on his sister as his caretaker and his lack of experience living independently, maintaining a bank account, and remembering appointments; and (4) the fact that he has a lot of "stuff going on his mind" and spends his days trying to clear up thoughts in his head. The ALJ's opinion, however, shows that the ALJ considered Plaintiff's abilities despite these limitations and based her decision on consideration of all of the evidence in the record, and concluded that Plaintiff was capable of a higher degree of interacting with the general public.

It is readily apparent from reviewing the ALJ's decision that the ALJ considered all of Plaintiff's mental health symptoms and resulting limitations, but decided, based on all of the evidence, that Plaintiff was not as seriously limited as Dr. Snook believed him to be. The ALJ observed that Plaintiff testified that he lived in a boarding house with other boarders, that he did not like the boarders coming and going all of the time, nevertheless, there were no reported difficulties with Plaintiff living in the boarding

house. (Tr. 23). The ALJ pointed out that Plaintiff remains in the boarding house, despite the other boarders. (Tr. 23). Furthermore, while the ALJ acknowledged that Plaintiff was socially isolated, does not know his neighbors, and interacts primarily with his sister, the ALJ also pointed out that Plaintiff is able to go out to dinner with her (in public), he gets along with his family members, he is able to interact with others while shopping for food and beer with no reported problems, and he socializes with different people in his neighborhood for the purpose of smoking marijuana. (Tr. 18, 23, 55).

Despite Plaintiff's contention that the ALJ did not consider his lack of independence from his sister and his sister's role as a caretaker, the ALJ's decision reveals that the ALJ did consider Plaintiff's sister's role as a caretaker. The ALJ acknowledged that Plaintiff's sister prompts him about grooming and hygiene, assists him with chores, assists him with transportation, schedules his doctor's appointments, and allows him to live in her boarding house. (Tr. 18, 20). The ALJ also observed, however, that Plaintiff reported he is able to complete tasks such as washing cars, he shops in stores with no reported problems, he drives a pickup truck two days a week to get food and to obtain a carwash job (meaning he can read traffic signs, avoid routine road hazards and appreciate on-coming and same directional traffic), and he could independently use public transportation with no problems. (Tr. 23-24, 49, 54, 222).

Although the ALJ did not specifically reference Plaintiff's statement during the hearing that Plaintiff has a lot of "stuff going on his mind" and spends his days trying to clear up thoughts in his head, the ALJ thoroughly addressed Dr. Snook's findings

28

about Plaintiff's agitation and poor focus, as well as reports of Plaintiff's paranoia and hallucinations. The ALJ observed that Plaintiff's mental health providers have not admitted him for inpatient care and have indicated that he had no perceptual disturbances or hallucinations and symptoms of psychosis, his current provider has only encouraged him to start group therapy, he has not had any suicidal ideations and has not taken any psychotropic medications, his providers have reported his thought processes as clear, and he is able to complete tasks like washing the interior and exterior of cars, drive cars, and independently utilize public transportation. (Tr. 18, 24). While Plaintiff's argument that he is more limited may be a permissible view of the evidence, so too is the ALJ's viewpoint, and in light of the medical evidence finding Plaintiff less impaired, Plaintiff's demeanor during the hearings, and Plaintiff's daily activities, the ALJ had substantial evidence to reject the more severe limitations in Dr. Snook's opinion. (Tr. 75-86, 89-101, 269-72, 280-281, 301-02).

Plaintiff contends that his activities of daily living are not particularly probative because they at most show that he is capable of sporadic and intermittent activities of short duration. Participation in everyday activities of short duration, such as housework or fishing, does not disqualify an claimant from disability. Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997). In this case, however, the ALJ addresses daily activities that reflect Plaintiff's ability to interact on a long-term basis over time, such as the fact that Plaintiff lives in a boarding house with others, yet there are no reported problems and that Plaintiff has maintained long-term relationships with his sister and his brothers.

29

(Tr. 23-24).

Additionally, the ALJ did not merely rely upon Plaintiff's limited daily activities, the ALJ also relied upon Plaintiff's medical records, Plaintiff's demeanor at the hearing, Plaintiff's treatment records, the state agency reviewing medical consultant opinions, Plaintiff's and his sister's statements about his abilities, and the examining consultants' opinions to ascertain the whole picture of Plaintiff's ability. Babeau v. Berryhill, No. 7:18-CV-1369-CLS, 2019 WL 2435867, at *2 (N.D. Ala. June 11, 2019) (explaining that while it would not have been appropriate for the ALJ to rely upon the activities of daily living alone, the ALJ's assessment of Plaintiff's ability also included his medical records and was therefore supported by substantial evidence). In this case, the state agency non-examining medical consultants also reviewed Plaintiff's treatment records, statements from Plaintiff and his sister, and the mental status examination conducted by Dr. Besses, the examining consultant. The state agency non-examining medical consultants found Plaintiff was no more than moderately limited in any of the areas of mental functioning. (Tr. 82-87, 97-99). The state agency non-examining medical consultants also relied upon the assessment of Dr. Besses, who found Plaintiff (1) was not impaired in his ability to understand, carry out and remember complex or detailed instructions; (2) moderately limited for sustaining concentration, persistence and pace for timely completion of assigned tasks due to subjective distress and chronic irritability; (3) moderately limited in his ability to interact appropriately with coworkers, supervisors, and the public; (4) moderately limited in his ability to adhere to a typical

30

work schedule; and (5) moderately limited in his ability to adapt to the stressors of a typical work environment.

Plaintiff argues the ALJ's reliance on state agency medical consultants is not persuasive because they did not have the benefit of later-submitted evidence, including the third party statement from Plaintiff's sister, the records from View Point, or Dr. Snook's opinions. It is true that the state agency medical consultants did not have a copy of Plaintiff's sister's letter dated July 20, 2016, in which Plaintiff's sister indicated that Plaintiff has difficulty communicating with people, suffers from violent agitation, anxiety attacks, delusions, audio hallucinations, has difficulty concentrating, and has difficulty remembering and carrying out basic instructions. (Tr. 255). The state agency consultants did, however, have the benefit of third-party function reports Plaintiff's sister prepared. (Tr. 78, 93). Therein, Plaintiff's sister reported that he has trouble adjusting to strangers and changes in his routine, that he often becomes irritable and sometimes paranoid, that he is uncomfortable with authority and paranoid around strangers, that he has to have reminders to take medicine and to groom himself, that it is not safe for him to perform yard work, and that he has trouble with memory, concentration, understanding, talking, completing tasks, and getting along with others. (Tr. 195, 198, 200). The state agency consultants also had the benefit of Dr. Besses' report which included information from an interview of Plaintiff's sister. (Tr. 278). Plaintiff's sister reported to Dr. Besses that Plaintiff had recently been isolating himself from family members, and he had been having episodes where he would get agitated, he

31

would be uncooperative, he wanted to be alone, and he acted suspicious and confrontational. (Tr. 278). Plaintiff's sister also described examples of Plaintiff's paranoid behavior at home and times in which Plaintiff had been complaining of "hearing family members who are no longer alive or who are not present." (Tr. 279). Plaintiff, himself, described hallucinations he claimed to have as well as his belief that people and/or the government were listening in him with microphones in the ground. (Tr. 279). Thus, Plaintiff's sister's letter is consistent with her former function reports and interview with Dr. Besses, which were available to the state agency consultants. Thus, the fact that the letter from Plaintiff's sister was not available in the record for the state agency consultants is immaterial because it was cumulative.

Similarly, although the non-examining consultants did not have the benefit of View Point's records, they had the benefit of records from Newport Integrated Behavioral Health ("Newport") and Dr. Besses. There is no indication that Plaintiff's condition significantly changed when View Point began treating Plaintiff. On review of these records, Plaintiff complained of the same types of symptoms to Dr. John Moseri at Newport. (Tr. 269). Plaintiff reported worsening depression symptoms as well as psychotic symptoms, hallucinations, paranoia, and delusions. (Tr. 269). Dr. Moseri noted that Plaintiff's behavior was described as disorganized, episodes of inappropriate anger were described, delusional ideas had been expressed and reported by others, memory difficulties were present, and that he was inattentive and irritable. (Tr. 269, 271). Also, as discussed above, the same types of symptoms were reported to Dr.

Besses.  (Tr. 276-81).

While it is also true that the non-examining medical consultants did not have the benefit of Dr. Snook's report, Dr. Snook's report just appears to be a different interpretation on the same symptoms and evidence as available to Dr. Besses and the non-examining medical consultants.  There is no indication that the behavior and reported symptoms evaluated by Dr. Snook were significantly different from the behavior Plaintiff exhibited during his visit to Dr. Besses.  Plaintiff presented to Dr. Snook as hostile, agitated, and non communicative.  (Compare Tr. 320, 322 with Tr. 276-81).  Similarly, Dr. Besses opined that Plaintiff displayed a predominately agitated and fearful affect, was distracted and off-task, presented as suspicious, indicated that Plaintiff's thought process was characterized by frequent derailment while talking, Plaintiff's voice was soft and hard to follow, Plaintiff was uncooperative, and Dr. Besses suspected that Plaintiff was malingering.  (Tr. 276-81).  There is no indication that Plaintiff's condition significantly changed for the worse upon seeing Dr. Snook.  Thus, the fact that the non-examining medical consultants did have the benefit of Dr. Snook's report is not a basis for rejecting their opinion.

C.    **The ALJ's Consideration of Plaintiff's Demeanor at the Hearing**

Plaintiff further contends that his demeanor at the hearing were not inconsistent with his symptoms, that the ALJ did not explain how his purported capabilities at the hearing contradict his alleged symptoms, and that the ALJ did not state which symptoms and functional limitations were found to be unsupported.  In response, the Commissioner

33

points out that the ALJ only assigned Plaintiff's demeanor at the hearing "slight weight," that his demeanor was only a factor among many the ALJ considered, and that Plaintiff's demeanor during the hearing, when considered in light of the contemporaneous medical evidence, did not support the degree of severity, intensity, and persistence of Plaintiff's symptoms.

In this case, Plaintiff alleges that he has trouble sleeping, that his family has to remind him to do things, that he has problems getting along with his family, friends and neighbors and needs to be alone, and that he has trouble with talking, completing tasks, concentration, understanding, and following instructions. (Tr. 219-223). Likewise, Plaintiff's sister stated that he gets irritable and paranoid, has trouble adjusting to strangers and changes in his routine, he has trouble following instructions, that he needs verbal direction and constant supervision depending on the task, and agrees that he has difficulty with talking, memory, completing tasks, concentration, understanding, following directions, and getting along with others. (Tr. 195-200). It is true that the ALJ did not explicitly spell out every way in which Plaintiff's complaints of symptoms were less credible due to his performance at the hearing. Nevertheless, not much of an inferential leap is required to discern that the ALJ was discussing Plaintiff's ability to interact with others, to maintain concentration, to remember, and to communicate. It is apparent that when the ALJ discussed Plaintiff's attentiveness during questioning, ability to sustain conversation and maintain his train of thought, and answer questions with meaningful responses without confusion, the ALJ was considering Plaintiff's

34

ability to concentrate, be attentive, remember, communicate, and interact with others under stressful situations. (Tr. 22). Indeed, the ALJ spelled out that there was no evidence that Plaintiff had difficulty understanding verbal communications or expressing himself verbally. (Tr. 22). This conclusion is bolstered by the fact that the ALJ pointed out that Plaintiff was able to testify regarding his educational level, living arrangements, ability to drive, his applications for jobs, his work at a car wash and the amount he was paid per car, as well as his mental health treatment and side effects of his medications. (Tr. 22).

Plaintiff contends that his performance at the hearing was consistent with his symptoms because the ALJ had to tell him to raise his voice and to give verbal responses. Additionally, Plaintiff testified at some point that he did not feel too good, requested some water, left the hearing room, and then when he returned to the room, he gave many one-word responses to the ALJ's questions. Finally, at one point Plaintiff confessed that he was nervous, that he felt like he was a fish in a fish bowl and that with all the questions, he was just ready to go, and that he felt like he was a bunch of different pieces of broken glass and that he was trying to put it together, but it was not coming together. While there is evidence that Plaintiff was nervous, uncomfortable, and sometimes awkward during the hearing, it would not require severe mental health symptoms for one to be nervous or uncomfortable during the hearing. Moreover, the fact remains that Plaintiff was able to perform despite feeling uncomfortable, his nervousness, and despite his impairments. The ALJ is permitted to take notice and

35

consider Plaintiff's performance at the hearing as long as she does not discredit Plaintiff's complaints about his symptoms solely on that basis.  <u>Macia v. Bowen</u>, 829 F.2d 1009, 1011 (11th Cir. 1987).

Here, as noted above, the ALJ examined the entire record when rejecting Plaintiff's complaints of symptoms.  The ALJ considered the opinions of the professionals who treated Plaintiff, Plaintiff's daily activities, Dr. Snook's opinion, and the nonexamining state agency medical consultants. (Tr. 20-24).  Furthermore, Plaintiff does not show how his struggles at the hearing supports the notion that his mental health capacity was more limited than that identified in the ALJ'S RFC finding.  Consistent with Plaintiff's performance at the hearing, the RFC indicated that Plaintiff was able to maintain concentration for periods of two hours at a time during an eight-hour work day, was able to ask simple questions in a nonpublic area, and his interaction with the general public, coworkers, and supervisors should be brief, superficial and occasional. (Tr. 19).

### D.    <u>Consideration of Listing 12.03</u>

Finally, Plaintiff contends that the ALJ erred because she did not explicitly address listing 12.03.  In support, Plaintiff avers that he specifically requested that the ALJ consider his eligibility to meeting listing 12.03 and points out that he qualifies for the listing because he has a diagnosis of schizoaffective disorder and Dr. Snook's findings show that he meets each of the elements of the listing.  In response, the Commissioner contends that Plaintiff's argument is cursory and fails to reference specific objective medical findings showing how he satisfies the criteria of listing 12.03.

36

At step three of the sequential evaluation process, the ALJ must determine whether the claimant's impairments meet or equal the criteria contained in the Listings of Impairments. 20 C.F.R. § 416.924(d); 20 C.F.R., pt. 404, subpt. P, app. 1. A claimant is conclusively presumed to be disabled if he meets or equals the level of severity of a listed impairment. Perkins v. Comm'r, Soc. Sec. Admin., 553 F. App'x 870, 872 (11th Cir. 2014), citing Crayton v. Callahan, 120 F.3d 1217, 1219 (11th Cir. 1997). "In order to meet a listing, the claimant must meet all of the specified medical criteria, and an impairment that fails to do so does not qualify no matter how severely it meets some of the criteria." Perkins, 553 F. App'x at 872, citing Sullivan v. Zebley, 493 U.S. 521, 530 (1990). Plaintiff bears the burden of proving his impairment meets a listing. Perkins, 553 F. App'x at 872; Wilbon v. Comm'r Soc. Sec., 181 F. App'x 826, 828 (11th Cir. 2006), citing Wilkinson o/b/o Wilkinson v. Bowen, 847 F.2d 660, 662 (11th Cir. 1987).

In this case, the ALJ did not specifically address whether Plaintiff met listing 12.03. Although the ALJ must consider the listings, there is no requirement that the ALJ mechanically recite the evidence leading to her ultimate determination, and a finding that the claimant's impairments are not contained in the listings may be implied by the ALJ's decision. James v. Comm'r of Soc. Sec. Admin., 657 F. App'x 835, 837 (11th Cir. 2016) (explaining that although it was true that ALJ never explicitly discussed whether the claimant met Listing 12.05(c), a finding that the claimant's impairments are not contained in a listing may be implied in the decision); Flemming v. Comm'r of the

Soc. Sec. Admin., 635 F. App'x 673, 676 (11th Cir. 2015) (explaining that the fact that the ALJ did not mention Listings 12.02 or 12.03 at step three does not mean the ALJ did not consider those listings and that "in the absence of an explicit determination, [the court] may infer from the record that the ALJ implicitly considered and found that a claimant's disability did not meet a listing"); Gray ex rel. Whymss v. Comm'r of Social Sec., 454 F. App'x 748, 749-50 (11th Cir. 2011); Davenport v. Astrue, 403 F. App'x 352, 354 (11th Cir. 2010); Hutchison v. Bowen, 787 F.2d 1461, 1463 (11th Cir. 1986). For instance, where the decisions shows that the ALJ considered and discussed the plaintiff's impairments relevant to the listing, but found that they were not as severe as what was called for the in the listing, no reversal for consideration of the listing is required. Flemming, 635 F.app'x at 677.

In this case, although the ALJ did not directly address Listing 12.03, it is apparent that she implicitly found that Plaintiff did not meet the listing. Listing 12.03 requires as follows:

> 12.03 Schizophrenia spectrum and other psychotic disorders (see 12.00B2), satisfied by A and B, or A and C:
>
> A. Medical documentation of one or more of the following:
> 1. Delusions or hallucinations;
> 2. Disorganized thinking (speech); or
> 3. Grossly disorganized behavior or catatonia.
>
> AND
>
> B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):
> 1. Understand, remember, or apply information (see 12.00E1).

2. Interact with others (see 12.00E2).
3. Concentrate, persist, or maintain pace (see 12.00E3).
4. Adapt or manage oneself (see 12.00E4).

OR

C. Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:
1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and diminishes the symptoms and signs of your mental disorder (see 12.00G2b); and
2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

Listing 12.03, 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.03 (2017).

In this case, it is clear from the opinion that the ALJ did not find that Plaintiff met the requirements of paragraph B because she did not include that Plaintiff had an extreme or marked limitation in any of the areas of mental function. (Tr. 18). Furthermore, the ALJ explicitly found Plaintiff did not meet the paragraph C criteria with respect to listings 12.04 and 12.06. (Tr. 17, 19). The paragraph C criteria for listings 12.04 and 12.06 are exactly the same as the paragraph C criteria for listing 12.03. Plaintiff does not dispute the reasoning the ALJ offered for why Plaintiff did not meet the Paragraph C criteria. Under these circumstances, it is apparent the ALJ implicitly found that Plaintiff did not meet listing 12.03.

## **CONCLUSION**

For the reasons stated above, it is hereby **ORDERED** that the decision of the

AO 72A
(Rev.8/82)

Commissioner be **AFFIRMED**.

      **SO ORDERED** this   27   day of September, 2019.

                                   LINDA T. WALKER
                                   UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)